**BUSINESS AIR CENTER, INC.,
and Ken Hill**

v.

**PURITAN INSURANCE COMPANY and
Southern Marine & Aviation
Underwriters.**

**Civ. No. 81–2103.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Sept. 11, 1984.

Drew Ranier, Baggett, McCall & Ranier, Lake Charles, La., Tom H. Davis, Byrd, Davis & Eisenberg, Austin, Tex., for plaintiffs.

Esmond Phelps, II and James E. Churchill, Jr., New Orleans, La., for defendants.

VERON, District Judge.

### RULING

### I. INTRODUCTION

This matter comes before the court on the motion of defendants Puritan Insurance Company ("Puritan") and its aviation manager, Southern Marine & Aviation Underwriters, Inc. ("Southern Marine") for summary judgment. Plaintiff Business Air Center ("Business Air"), an Arizona corporation, instituted this diversity action against Puritan, a Connecticut corporation, and Southern Marine, a Louisiana corporation, to recover damages suffered from the loss of a Merlin III aircraft. The plane was insured by Policy No. H–4–5863 issued by Puritan to Business Air and Air Sal. Exclusion 11 of the insurance policy disavows liability "for *loss* or damage *due to conversion,* embezzlement or secretion *by any person in possession of the aircraft under a* bailment, *lease,* conditional sale, purchase agreement, mortgage or other encumbrance" (emphasis added). Business Air leased the plane to Richard Schoor (Air Sal) late in May 1981, and shortly thereafter the plane crashed in Cameron Parish, Louisiana, killing Schoor, the pilot, and Millige Jones, the second Pilot. Puritan denied Business Air's loss claim and declares that it is entitled to summary judgment because the following alleged facts show that Schoor converted the plane within the meaning of Exclusion 11:

"(a) Schoor was a lessee ....

"(b) At the time of the loss, Schoor was abusing and misusing the aircraft.

"(c) At the time of the loss, Schoor was attempting to smuggle marijuana

into the United States in violation of federal laws and regulations and in violation of state law.

"(d) At the time of the loss, Schoor was intentionally flying the aircraft in a dangerous and reckless manner in order to avoid radar coverage and in violation of federal laws, rules and regulations.

"(e) The pilot flying the aircraft at the time of the loss, Schoor, the lessee, was not qualified in accordance with the terms of said insurance policy.

"(f) At the time of the loss, Schoor was intentionally flying in instrument weather conditions but without an instrument flight plan which was in violation of federal laws, rules and regulations.

"(g) At the time of the loss, Schoor was intentionally flying below the minimum allowable altitude specified by federal laws, rules and regulations for instrument flight conditions....."

Memorandum in Support of Motion for Summary Judgment at 5.

Business Air contends that Exclusion 11 refers to conversion in the criminal sense rather than as a tort, that there is no evidence that Schoor committed the crime of conversion, and that summary judgment is therefore inappropriate.

## II. CHOICE OF LAW

■ Both Louisiana and Arizona have a legitimate interest in the outcome of this diversity suit,[1] making our threshold question which state's law should determine the meaning of the conversion exclusion. As a federal court sitting in diversity we are bound to follow the choice-of-law rules of the forum state, Louisiana. *Klaxson Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). On its face Article Ten of the Louisiana Civil Code adopts the rule of *lex loci,* also known as the "situs" rule, making the governing law that of the state in which the contract was executed.[2] The state of execution, with respect to an insurance contract, is the state in which the policy was delivered and the first premium collected. *Theye Y Ajuria v. Pan American Life Ins. Co.*, 245 La. 755, 161 So.2d 70, *cert. denied*, 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1964). At this point in the litigation it is unclear whether the policy was delivered in Louisiana,[3] but a close analysis of the applicable choice-of-law principles developed by the courts convinces us that Louisiana law nevertheless governs its application.

Despite the apparent clarity of Article Ten, Louisiana's choice-of-law rule for contract cases, as well as its interpretation by federal courts, has been in a state a flux for over twenty years. During the mid-1960's United States Circuit Judge Albert Tate, then sitting on the Louisiana Court of Appeals, Third Circuit, developed a line of three cases retreating from the *lex loci* rule and looking to the state having the "most significant contracts" with the action; two were contract cases. *See Universal C.I.T. Credit Corp. v. Hulett*, 151 So.2d 705 (La.App., 3rd Cir.1963) (Judge Tate) (contract case); *Doty v. Central Mu-*

---

**1.** A diversity court faces a square choice-of-law problem when more than one state has "some interest in seeing that its laws are applied to the case other than the mere concern of a forum that its rules of trial administration be followed." *Brinkley & West, Inc. v. Foremost Ins. Co.*, 499 F.2d 928, 932 (5th Cir.1974). Both Louisiana and Arizona have a legitimate interest in the outcome of this case. Louisiana, as the home state of the insurance underwriter, Southern Marine, and the site of the crash, undoubtedly has more than a mere forum's interest. Arizona, as the residence of the insured, Business Air, and the state in which the aircraft was to be based, also has an extra-forum interest.

**2.** The first sentence of Article Ten provides:
The form and effect of public and private instruments are governed by the laws and usages of the places where they are passed or executed.

**3.** At this point in the litigation, we know only that the insurance contract was negotiated across state lines: Business Air, an Arizona corporation, sought an insurance quote from Dan Flowers Associates, a Kansas corporation, which obtained a quote from Puritan, a Connecticut corporation, through Puritan's aviation underwriter, Southern Marine & Aviation, a Louisiana corporation.

*tual Insurance Co.*, 186 So.2d 328 (La. App., 3rd Cir.1966) (Tate, J., concurring) (contract case); *Blanchard v. Blanchard*, 180 So.2d 564 (La.App., 3rd Cir.1965) (Tate, J., concurring) (tort case).[4] And United States District Judge Ben Dawkins, Jr. emphasized significant contacts in a 1968 insurance-contract case, holding that "we believe the Louisiana Supreme Court would be influenced by Judge Tate's enlightened expression in *Hulett, Doty,* and *Blanchard, supra.*" *Lester v. Aetna Life Ins. Co.*, 295 F.Supp. 1208, 1213 (W.D.La.1968), *aff'd,* 433 F.2d 884 (5th Cir.), *cert. denied,* 402 U.S. 909, 91 S.Ct. 1382, 28 L.Ed.2d 650 (1971).

The Louisiana Supreme Court nevertheless rejected use of the significant-contacts approach in tort cases, *Johnson v. St. Paul Mercury Ins. Co.*, 256 La. 289, 236 So.2d 216 (1970), and the United States Fifth Circuit Court of Appeals held that *Johnson* denounces the doctrine so emphatically as to discard it *in toto. Lester v. Aetna Life Ins. Co., supra,* 433 F.2d at 888–89 & n. 13.[5] But despite having extended *Johnson* to contract cases in its first breath, the Fifth Circuit denuded Article Ten, in its second, by recognizing an exception to the rule of *Klaxson, supra.*

Specifically, the Fifth Circuit held in *Lester, supra,* that the federal courts can bypass the choice-of-law rule of the forum state in cases of "false conflict," where only one state has any legitimate interest in the case. 433 F.2d at 889–90. And it reaffirmed the validity of that exception in *Challoner v. Day and Zimmerman, Inc.*, 512 F.2d 77 (5th Cir.), *rev'd per curiam, Day and Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975). The United States Supreme Court repudiated *Lester* and *Challoner,* however, holding that the rule of *Klaxson* is inviolable. *Day and Zimmerman, Inc. v. Challoner, supra,* at 4, 96 S.Ct. at 168. Of course, by merely proscribing exceptions to that rule, *Day and Zimmerman* left state courts free to adopt the false-conflicts doctrine or any other as an exception to their own local choice-of-law statutes. *Id.,* at 5, 96 S.Ct. at 168 (Blackman, J., concurring); *Lee v. Hunt,* 631 F.2d 1171, 1175 n. 5 (5th Cir.1980). Thus *Day and Zimmerman* tacitly approved the decision of the Louisiana Supreme Court in *Jagers v. Royal Indemnity Co.*, 276 So.2d 309 (La.1973) (pre-*Day and Zimmerman* ), overruling *Johnson* in favor of a more sophisticated approach to conflicts of law.

■ At first blush *Jagers, supra,* appears to adopt the Fifth Circuit's reasoning in *Lester* and *Challoner,* holding that the *lex loci* rule applies exclusively to cases embodying "true" conflict. But shortly after *Jagers* the Fifth Circuit heeded *Jagers*'s cryptic reference to the Second Restatement of Conflict of Law,[6] holding that *Jagers* surpasses the false-conflicts doctrine and adopts the *Restatement*'s enlightened "interest analysis" as Louisiana law. *Brinkley & West, Inc. v. Foremost*

---

**4.** In these cases Judge Tate found authority for the significant-contacts approach in the second sentence of Article Ten:

> But the effects of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.

**5.** The Fifth Circuit wrote:

> In *Johnson,* the court said that in their present state the "center of gravity" or "grouping of contracts" or related doctrines are in their formative stages and will not lend themselves to a sound declaration of new law. The message is loud and clear. The Louisiana Supreme Court is not ready to abandon the *lex loci* approach.
>
> Moreover, we do not believe that *Johnson* may be distinguished by asserting that it is a *lex loci delicti* case inapplicable to *lex loci*

*contractus cases.* The court in at least three places in its exhaustive opinion emphasized that it would not abandon the *lex loci* approach in favor of the modern trend. [footnoting 236 So.2d at 223 (two passages); *Id.;* at 224 (one passage).]

> The Louisiana Supreme Court used *lex loci* in the broad generic sense embracing both *lex loci delicti* and *lex loci contractus.*
>
> Furthermore, we are not convinced that the Louisiana Supreme Court would deviate from the "place of delivery" rule to avoid a harsh result in an individual case....

433 F.2d at 888–89 (footnote 13 omitted).

**6.** After holding that Article 10 does not apply in cases of false conflict, the *Jagers* court stated cryptically:

> That some modern methods for determining whether to apply the law of the forum are

*Ins. Co.,* 499 F.2d 928, 932 (1974). Although *Jagers* is strictly a tort case, most subsequent decisions by Louisiana courts [7] and by federal courts sitting here [8] have applied the interest analysis to contract cases. We conclude that Louisiana has adopted the *Restatement*'s interest analysis as its current method of resolving choice-of-law problems in contract actions.

◼ Having settled on the applicable choice-of-law rule, we now apply it to our case. Section 6(2) of the *Restatement* lists seven factors that the courts use in determining which of the competing states' interests is paramount.[9] Applying the three relevant factors—(2)(b) "the relevant policies of the forum," (2)(c) "the relevant policies of other interested states, and (2)(g) "ease in the determination ... of the law to be applied"—we find that Louisiana has a greater interest in this case than does Arizona. Arizona has a manifest interest in enforcing insurer obligations that affect

the right of its citizens to collect the policy limits for which they have paid premiums. Louisiana has a somewhat stronger interest in enforcing policy exclusions that affect the liabilities of its insurance underwriters; Louisiana's interest in this case encompasses the entire scope and all the ramifications of the original liability claim, including the indemnification claim of the insurer to its underwriter. Our greater ease in determining Louisiana law than Arizona law tips the interest analysis decidedly in favor of Louisiana; as a court sitting in Louisiana we are obviously much more familiar with Louisiana law.[10] Louisiana law accordingly must govern the interpretation of the conversion exclusion.

## III. INTERPRETING THE "CONVERSION" EXCLUSION

As we noted p. 1, *infra,* Exclusion 11 denies hull coverage for "*loss* or damage

faulty in some respects should not deter a court in the application of the law of the forum to its citizens when not otherwise prohibited.

276 So.2d at 312. The court then footnoted this statement as follows:

For choice-of-law principles, *see* Restatement, Second, Conflict of Laws, § 6 (1969):

"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law,

"(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include,

"(a) the needs of the interstate and international systems

"(b) the relevant policies of the forum

"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

· "(d) the protection of justified expectations

"(e) the basic policies underlying the particular field of law

"(f) certainty, predictability and uniformity of result, and

"(g) ease in the determination and application of the law to be applied."

*Id.,* at 312 n. 3.

7. *Wickham v. Prudential Ins. Co. of Am.,* 366 So.2d 951, 954 (La.App., 1st Cir.1978); *Sutton v. Langley,* 330 So.2d 321, 326–28 (La.App., 2d Cir.), *writs denied,* 332 So.2d 805, 333 So.2d 242 (La.1976); *see In re Succession of Dunham,* 393 So.2d 438, 444–45 (La.App., 1st Cir.), *writ granted,* 397 So.2d 802 (La.1981). *Contra, Wickham,*

*supra,* at 954–55 (Edwards, J., dissenting); *Stark v. Marsh,* 314 So.2d 465, 467 (La.App.1975).

8. *Lee v. Hunt,* 631 F.2d 1171, 1176 (5th Cir. 1980), *cert. denied,* 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *Brawner v. Kaufman,* 496 F.Supp. 961, 962 (E.D.La.1980); *Southern Ins. Co. v. Consumer Ins. Agency,* 442 F.Supp. 30 (E.D.La.1977); *see Fenasci v. Travelers Ins. Co.,* 642 F.2d 986, 992 (5th Cir.1981); *Highland Ins. Co. v. Employers' Surplus Lines Ins. Co.,* 497 F.Supp. 169, 171 (E.D.La.1980). *Contra, Porter v. American Optical Corp.,* 641 F.2d 1128, 1145 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *but see Sprow v. Hartford Ins. Co.,* 594 F.2d 418, 421 (5th Cir. 1979).

9. *See* note 6, *infra,* for a complete listing of the factors.

10. In *Brinkley & West, Inc. v. Foremost Ins. Co., supra,* at 935, the Fifth Circuit warned that Factor (g) alone cannot justify the choice of Louisiana law. But *Brinkley* can be read to go one step farther—to preclude us from making our greater familiarity with Louisiana law than other states' law the "tie-breaker" in interest analysis. We have avoided the rocky shoals of *Brinkley* by explicitly finding that Louisiana's interest in protecting its underwriters is somewhat stronger than Arizona's interest in protecting its policyholders. Our great ease in determining Louisiana law than Arizona law merely makes our decision to apply the former more compelling.

*due to conversion,* embezzlement, or secretion *by any person in possession of the aircraft under a* bailment, *lease,* conditional sale, purchase agreement, mortgage or other encumbrances" (emphasis added). At common-law the term "conversion" can refer either to a tort or to a crime, but the policy makes no attempt to specify which it means. Criminal conversion implies "some kind of willful purpose and wrongful intent in the taking of property that does not belong to the converter." *United States v. Lester,* 541 F.2d 499, 502 (5th Cir.1976). "[I]n a civil tort action for conversion, the intent, good faith or mistake on the part of the converter would not be relevant"; tortious conversion requires only the exercise of wrongful dominion over another's personal property that is inconsistent with the owner's right. *Id.,* at 502 n. 4. Puritan and Southern Marine have no chance of prevailing on their summary-judgment motion unless Exclusion 11 refers to civil conversion, because we have been presented with no evidence (nor even an allegation) that Richard Schoor intentionally crashed the plane.

Business Air argues that Exclusion 11 refers to conversion in the criminal sense because "this term is used in connection with the term 'embezzlement' which implies to the ordinary person some criminal activity." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 6. Puritan and Southern Marine declare that if we define conversion "in common sense terms as would be understood by an average layman," Exclusion 11 clearly refers to conversion in the civil sense. Memorandum in Support of Motion for Summary Judgment at 7. Business Air's position is fortified by special rules of construction applicable to insurance contracts. The threshold principle is that the insurer must clearly state exclusions and limitations to policy coverage. *Benton Casing Service, Inc. v. Avemco, Inc.,* 379 So.2d 225, 232 (La.1979); *Snell v. Stein,* 261 La. 358, 259 So.2d 876, 878–79 (1972); *Kendrick v. Mason,* 234 La. 271, 99

So.2d 108, 116 (1958). Any lack of clarity and any ambiguity in the policy is held against the insurer, against forfeiture of coverage. *Godfrey v. United States Casualty Co.,* 167 F.Supp. 783, 790 (W.D.La. 1959) (applying Louisiana law); *Benton Casing, supra,* at 232; *Albritton v. Fireman's Fund Ins. Co.,* 224 La. 522, 70 So.2d 111, 113 (La.1954). The courts are required to give a green light to coverage even when the insurer's interpretation of the policy exclusion is as "equally reasonable" as the insured's, on the theory that it would be unjust to construe an ambiguous provision in favor of the party that drafted it. *Zoller v. State Board of Education,* 278 So.2d 868, 870 (La.App., 1st Cir.1973).

Puritan and Southern Marine seek support for their position in the principle that words of an insurance policy should be construed in their common and popular sense. *Taylor v. State Farm Mutual Insurance Co.,* 248 La. 246, 178 So.2d 238, 241 (1965) (quoting LSA–C.C. Art. 1946[11]); *Andrus v. Police Jury of Parish of Lafayette,* 270 So.2d 280, 282 (La.App., 3rd Cir. 1972); *Conner v. Motors Ins. Co.,* 216 So.2d 555, 557 (La.App. 3rd Cir.1968). The special rules of construction favoring the insured apply only when there is no popular understanding of the challenged terms and hence a true ambiguity. *Calcasieu Marine Nat. Bank v. Am. Emp. Ins.,* 533 F.2d 290, 296 (5th Cir.1976) (applying Louisiana law); *Andrus v. Police Jury of Parish of Lafayette, supra,* at 282; *see also American Casualty Co. v. Myrick,* 304 F.2d 179 (5th Cir.1962) (by implication). And the courts must refrain from stretching for ambiguity when it is not there; "[t]his is so even when the result is an apparently harsh consequence to the insured." *Calcasieu Marine Nat. Bank v. Am. Emp. Ins., supra,* at 296; *see Andrus, supra,* at 282.

Having reviewed the applicable caselaw, we observe that it places Puritan and Southern Marine in an almost untenable position. Louisiana law requires us to in-

**11.** Article 1946 provides:
The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular usage.

terpret insurance policies liberally and in favor of coverage. Unless there is overwhelming support for the insurers' argument that conversion popularly refers to a tort, we must accept Business Air's argument that Exclusion 11 refers to the crime of conversion. With that thought in mind we recite Corpus Juris Secundum's definition of conversion:

### § 1 Definition

In equity conversion is the exchange of property from real to personal, or from personal to real, which takes place under some circumstances in the consideration of the law, such as to give effect to directions in a will or settlement, or to stipulations in a contract, although no such change has actually taken place. Conversion in the physical sense of a change in the nature of real or personal property resulting from severance from or attachment to land is considered in C.J.S. Titles Property § 11, also 50 C.J. p. 768 note 91—p. 770 note 49, Logs and Logging §§ 2, 11, also C.J. p. 146 note 53—p. 147 note 60, p. 153 note 77—p. 155 note 88, Fixtures § 1 et seq., also 26 C.J. p. 651, note 1 et seq., *Conversion of personal property as constituting a tort see the C.J.S. Title Trover and Conversion, § 1, also 65 C.J. p. 11 note 2 et seq.*

18 C.J.S. § 1 (emphasis added).

Corpus Juris's definition refers to conversion "constituting a tort" but makes no reference to conversion constituting a crime, implying that in its common usage the term conversion denotes a tort. This definition alone cannot carry the insurers' argument, but Puritan and Southern Marine contend that the Eleventh Circuit's recent decision in *Swish Mfg. v. Manhattan Fire & Marine Ins.*, 675 F.2d 1218 (11th Cir.1982), raises the same implication. In that case Manhattan Fire & Marine, doing business as our movant Puritan Insurance, denied Swish Manufacturing's claim for plane damage upon the *same* conversion exclusion now before us. Swish sought payment of its claim in district court, but summary judgment was entered in Puritan's favor. On appeal the Eleventh

Circuit never addressed the issue whether Exclusion 11 refers to conversion in the civil sense or rather as a crime; it merely concluded that the plane had been converted under Georgia tort law and upheld the district court's decision.

Of course, an Eleventh Circuit opinion applying Georgia law does not bind this Court. But even leaving that fact aside, *Swish* yields no support for the insurers' position. We can draw no inference from the Eleventh Circuit's failure to examine the context in which Exclusion 11 refers to conversion because it was not presented with that issue. Our only alternative is to accept Business Air's argument that Exclusion 11 refers to conversion in the criminal sense.

## IV. CONCLUSION

For the foregoing reasons, we DENY the motion for summary judgment filed by defendants Puritan Insurance Company and Southern Marine & Aviation Underwriters.